IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOSEPH BAY                                                                    PLAINTIFF

v.                              Case No. 5:11-CV-05256

SHANNON BAY; KARIS CHASTAIN,
Arkansas State Police (CACD) Investigator,
in her individual capacity; KEN HUNT,
supervisor to Karis Chastain, in his individual capacity;
CHARLES DUELL, Deputy Prosecuting Attorney for 4th
Judicial District, Washington County, in his individual
capacity; MATT RAY, Detective with Springdale Police
Department, in his individual capacity; ABRA LANG,
Child Safety Center, Inc., in her individual capacity;
KAREN BLACKSTONE, Children's Safety Center, Inc., in
her individual capacity; KATHY O'KELLEY, in her
official capacity as Springdale Chief of Police; CITY OF
SPRINGDALE, ARKANSAS; and CHILDREN'S
SAFETY CENTER, INC.                                                          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

The following motions, responses, replies, and supporting evidence are now before the Court

for disposition:

• Motion for summary judgment (Doc. 83), brief in support (Doc. 84), and supporting

evidence filed by Defendants City of Springdale, Arkansas ("City of Springdale"),

Springdale Chief of Police Kathy O'Kelley ("O'Kelley"), and Detective Matt Ray

("Ray"); response in opposition (Doc. 96) and supporting evidence (Doc. 98) filed

by Plaintiff Joseph Bay ("Bay"); and reply (Doc. 100) filed by City of Springdale,

O'Kelley, and Ray;

• Motion for summary judgment (Doc. 87), brief in support (Doc. 88), and supporting

-1-

evidence filed by Defendants Abra Lang ("Lang"), Karen Blackstone ("Blackstone"), and Children's Safety Center, Inc. ("CSC"); and response in opposition (Doc. 97) and supporting evidence (Doc. 98) filed by Bay;

- Motion for summary judgment (Doc. 92), brief in support (Doc. 94), and supporting documents filed by Defendants Karis Chastain ("Chastain"), Deputy Prosecuting Attorney Charles Duell ("Duell"), and Ken Hunt ("Hunt"); response in opposition (Doc. 102) and supporting evidence (Doc. 103) filed by Bay; and reply (Doc. 105) filed by Chastain, Duell, and Hunt;

- Motion for leave to file supplemental reply to response to motion for summary judgment (Doc. 104) filed by City of Springdale, O'Kelley, and Ray; and

- Motion to dismiss Defendant Hunt (Doc. 101) filed by Bay.

First, the Court **GRANTS** Bay's motion to dismiss Hunt (Doc. 101) as a party to the lawsuit. All claims against Hunt are **DISMISSED WITH PREJUDICE** pursuant to Federal Rule of Civil Procedure 41(a)(2). Next, the Court observes that Bay has settled with Lang, Blackstone, and CSC and filed a stipulation of dismissal (Doc. 107). Consequently, all claims against Lang, Blackstone, and CSC are **DISMISSED WITH PREJUDICE**, and their motion for summary judgment (Doc. 87) is **DENIED AS MOOT**. Finally, the Court **DENIES** the motion for leave to file a supplemental reply by City of Springdale, O'Kelley, and Ray (Doc. 104).

The Court now turns to the two motions for summary judgment brought by City of Springdale, O'Kelley, and Ray (Doc. 83) and by Chastain and Duell (Doc. 94). Both motions are ripe for disposition.

## I.      Legal Standard

When faced with a summary judgment motion, the burden of proof is placed on the moving party to establish both the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 742 (8th Cir. 2009). The Court must review the facts in the light most favorable to the party opposing a motion for summary judgment and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## II.   Background

In resolving the two pending motions for summary judgment, the Court must view the facts in a light most favorable to Bay, the non-moving party. Accordingly, the following relevant facts are derived from Bay's amended complaint and submissions in opposition to both motions for summary judgment (Docs. 49, 98, 103, and all attached exhibits).

This case concerns the arrest and prosecution of Bay for allegations of sexual indecency with a minor, Bay's four-year-old daughter "PB." At the time these allegations surfaced, Bay had recently been divorced from PB's mother, Defendant Shannon Bay ("Ms. Bay"). Ms. Bay was awarded custody of PB, and Bay, as non-custodial parent, was awarded standard visitation.

In the summer of 2009, Ms. Bay observed PB rubbing her vagina with the tip of a stuffed animal's tail, and according to Ms. Bay, the child claimed her father had taught her to do this in his bedroom ("the stuffed animal incident"). Ms. Bay relayed the stuffed animal incident, as well as

PB's explanation, to a friend who was employed as a schoolteacher and required by law to report any incidence of child abuse to State authorities.  It appears that a call was made to the Arkansas Crimes Against Children Hotline ("a Hotline call") regarding this incident, and an investigation was opened shortly thereafter concerning the allegation that Bay was sexually abusing PB.  As part of this investigation, PB was interviewed at CSC in the summer of 2009 by child advocate Abra Lang.  The interview did not reveal that Bay had engaged in any sexually inappropriate behaviors with PB, and the case was closed.

In late 2010, another incident occurred involving Bay and PB.  Bay entered Ms. Bay's house and was sitting in a chair when PB began to crawl around on the floor.  Ms. Bay claims that PB placed her face in her father's genital area and said she wanted to hug and kiss his "wee-wee" goodbye ("the lap incident").  The next day, Ms. Bay told a school counselor about the lap incident, and a Hotline call was made on November 4, 2010.  This call initiated a second investigation by CSC into allegations of child sexual abuse by Bay.

On November 5, 2010, the November 4 Hotline call was referred to an investigator with the Department of Human Services ("DHS") Division of Children and Family Services.  DHS requested CSC to perform a forensic interview of PB.  PB was then interviewed by CSC for the second time on November 8, 2010.  The interviewer was CSC employee Karen Blackstone, a forensic interviewer with approximately ten years of experience.  The interview lasted approximately one hour and was recorded.  During the interview, PB stated that Bay had "one time" "showed his weenie," or penis, to her.  PB described that her father had "wiggled his weenie" at her.  She made a brief, one- to two-second, up-and-down or side-to-side hand gesture to illustrate how her father did this.  Then PB relayed how on one occasion she and her father bathed or showered together, and her father

"wiggled" his penis with his hand, telling PB he did this "to get the water out."  PB demonstrated

how the shower incident occurred by using an anatomically correct female doll, intended to represent

PB, and an anatomically correct male doll, intended to represent Bay.  PB removed the dolls'

clothing to demonstrate how she and her father took a shower together.  PB manipulated the hand

of the male doll to show how her father, in her words, "holded his weiner" before "wiggling it."  PB

also described how "water" came "out of the weenie" "in the water bath" and how the "water" was

"blue" or "half of yellow and blue" in color.

     In addition to the above, PB stated positive things about her father during the interview,

including that her father made her feel happy and was nice to her.  PB identified her father as

someone she would confide in if she were touched in a way that was confusing or hurt her.  During

the interview, Blackstone questioned whether PB had been coached by her mother on what to say.

PB responded somewhat equivocally, saying "yeah" at first, and later saying "no."  Further, at the

end of the interview, Blackstone questioned whether the story PB told about Bay "wiggling" his

penis was true or not true, and PB responded first that it was not true and later that it was true, after

some hesitation.  PB stated at one point during the interview that she was tired and at another point

that she was confused.

     After the interview, Blackstone made a Hotline call and created a written record of the call

as follows: "This interviewer made a [sic] Arkansas child abuse hotline [call] due to the disclosure

of exposure to live sex acts . . . ."  (Doc. 103, p. 7).  Lang and Defendant Ray, a Springdale police

detective, viewed PB's interview and met with Ms. Bay to tell her that they believed Bay had

engaged in inappropriate behavior in the shower with PB.  Lang and Ray, like Blackstone,

interpreted PB's words and actions in the interview to mean that Bay had masturbated in front of PB

in the shower.  Ms. Bay then informed Ray about the two earlier incidents she had witnessed involving PB and her father that were, in her opinion, of an inappropriate sexual nature, namely the stuffed animal incident that occurred in 2009 and the lap incident in 2010.  Ms. Bay also told Ray that she had viewed Bay's complete computer history in the past and knew that Bay visited pornography websites every day.  Ms. Bay also tried to show Ray certain allegedly incriminating emails that Bay had sent to her from his computer concerning PB, but Ms. Bay was unable to view the emails from her phone in their entirety.

Lang provided a copy of PB's interview DVD to Defendant Chastain, an investigator with the Arkansas State Police Crimes Against Children Division, the same day the interview occurred. Chastain conducts over 100 child forensic interviews a year.  She viewed the DVD of PB's interview and also spoke with Blackstone.  Chastain wrote a report referring the case to the Springdale Police Department for further investigation and faxed a copy of the report to the Washington County Prosecutor's office.  Chastain's report stated as follows:

> The alleged victim is 4 y.o. [PB] who resides in the home with bio mother Shannon Bay.  The alleged offender is bio father Joseph Bay.  DHS requested an interview for AV[1] after they received information that she was acting out sexually.  During a forensic interview AV stated that AO sleeps with her and takes a shower with her. AV also stated AO wiggles his penis and stuff comes out.  The last time is unknown but the last known time she visited AO was yesterday.  It is believed it happened more than one time."

(Doc. 98-9, p. 2).

Bay believes that a personal relationship exists or existed between Ms. Bay and Chastain, based upon a statement PB made in her interview with Blackstone in which PB mentioned speaking

---

[1]  "AV" stands for "alleged victim," and "AO" stands for "alleged offender" in Chastain's narrative.

with someone named "Daris," which to Bay sounds very much like Chastain's first name, Karis. Bay also believes Chastain produced reports that were biased against him, and that the nature of Chastain's reports indicates either a personal animus against Bay or a personal relationship with Ms. Bay.[2]

Chastain's report detailing her interpretation of PB's interview with Blackstone was forwarded to Ray along with a DVD of the interview. The same day Ray received Chastain's report, Ray attempted to contact Bay by visiting him at the school in which he worked as a teacher-trainer. Ray left his contact information at Bay's school. Later that same day, Bay called Ray to ask what Ray wanted from him. Ray refused to discuss the matter over the phone but asked Bay to meet him at the police station to get "his side of the story." Bay told Ray he believed Ms. Bay had been "making something up again." Bay stated that he wanted to speak to his attorney and would call Ray back. Ray did not tell Bay that he needed him to call back within a certain time period.

After talking with Bay on the phone and failing to convince him to come without counsel to police headquarters to give a statement, Ray and another officer returned to the elementary school where Bay worked and spoke with the principal of the school, trying to ascertain Bay's address. Ray told the principal that an investigation was being conducted on Bay in reference to sexual allegations made by a non-student. The principal then advised that Bay was attempting to speak with an attorney, and she provided Ray with Bay's post office box, but not his physical address. Ray then contacted Ms. Bay and obtained directions to Bay's house. When Ray later visited the house, he did not encounter Bay, but he left his business card at Bay's door and in Bay's mailbox.

---

[2] Bay also alleges that Chastain remained in the courtroom after testifying in the DHS proceedings brought against him, and Bay claims to have witnessed Chastain talking with and hugging some of Ms. Bay's friends after court.

The following day, November 9, 2010, Ray visited the County Prosecutor's office and presented a report to Defendant Duell, the Deputy Prosecuting Attorney. Ray believed after viewing PB's interview that Bay had masturbated in front of PB. Ray played the DVD of PB's interview for Duell and prepared an affidavit for warrant of arrest of Bay for the crime of sexual indecency with a minor. Duell testified in a deposition taken in this case that he did not take notes while the DVD of PB's interview was playing, and that he was periodically interrupted in viewing the DVD by people coming in and out of his office; however, Duell approved as to form Ray's affidavit for warrant of arrest. In the affidavit prepared by Ray and approved by Duell, Ray stated that Bay "with the purpose to arouse or gratify the sexual desires of himself or those of any other person, purposefully exposed his sex organs to a minor, and the Defendant is the minor's guardian." (Doc. 98-9, p. 61). A warrant was also obtained to enter Bay's home and seize his computer. *See id.* at p. 64.

Bay was arrested on November 10, 2010, at the school where he worked, in front of school officials, teachers, and students. Bay was then transported to the Criminal Investigations Division of the Springdale Police Department for questioning. During the interrogation, which was videotaped, Bay refused to admit he had ever masturbated in PB's presence, although he suspected he had probably urinated in her presence, and he agreed that in the past he had bathed and showered with PB. Bay denied he had committed sexual indecency with PB.

Sometime after Bay was arrested, Ms. Bay received a call from CSC asking her to bring PB in for another interview. The interview was prompted by yet another Hotline call. The Hotline caller stated that she/he had learned from PB that a male child approximately PB's age had been playing with PB at Ms. Bay's house, and during the playdate PB had tried to kiss the penis of the male child

("the playdate incident").  PB also intimated to the Hotline caller that she had kissed her father's penis.  Ms. Bay testified in her deposition that she was the only adult eyewitness to the playdate incident and that she overheard the exchange between PB and the male child.  Ms. Bay also stated that she urged PB to tell her therapist, who was required by law to report any incident of child abuse, what happened during the playdate incident.

On February 25, 2011, a hearing was held in the civil case brought by DHS stemming from the child sexual abuse charge brought against Bay.  Between November 10, 2010—the date of Bay's arrest—and February 25, 2011—the date of the DHS hearing—Ray interviewed a number of people in connection with the allegations of sexual abuse, including Ms. Bay, PB's former teacher, PB's current teacher, PB's school administrator, Ms. Bay's father, Ms. Bay's mother, Ms. Bay's sister-in-law, Ms. Bay's female friend, PB's babysitter, Bay's first ex-wife, Bay's teenaged son from Bay's first marriage, and the mother of the male child involved in the playdate incident. *See* Doc. 83-14, pp. 12-25.  Also, shortly after Bay was arrested PB underwent a forensic medical examination, which yielded no evidence of sexual abuse.

On March 7, 2011, Judge Stacy Zimmerman, Washington County Circuit Judge, ruled in the DHS case against Bay that "the evidence presented does not support a finding that the child is dependent/neglected.  There is no preponderance of the evidence that the father exposed the child to a 'live sex act' as the investigator concluded.  The fact that the child saw the father's penis, that he 'wiggled his penis and stuff came out' is not a sex act, but that the child witnessed her father urinating.  Furthermore, the other evidence presented fails to support a finding that the child was abused or neglected by her father."  (Doc. 98-10).

The same day the DHS case against Bay was dismissed, Duell decided to dismiss the criminal

charges against Bay in a nolle prosequi action.  Duell stated in his deposition that the reason why he decided to "nolle pros" the case was because he had learned from Bay's attorney, Joel Huggins, that PB had recanted her testimony.  Duell was also told by an attorney for DHS that PB "wanted to take it back," or recant.  The order for nolle prosequi, which was signed by Duell and the circuit judge assigned to the criminal case, was filed on March 10, 2011, and stated that the reason for ending the criminal case against Bay was that it was in the "best interest of the child not to pursue jury trial." (Doc. 98-9, p. 121).

Duell made a statement to the press that was published on March 11, 2011, after the criminal charges against Bay were dropped, that "Bay also agreed to a restriction meant to protect the child in the future."  Duell had learned from Bay's attorney that Bay had agreed to certain restrictions related to visitation[3] in the civil case brought by DHS; however, those restrictions were not part of a formal plea agreement related to the criminal charge, and those restrictions did not factor into Duell's decision to "nolle pros" the case.  Duell also told the press that the case was dropped to spare PB from being involved in a jury trial, but he did not tell the press that PB had recanted her testimony.

Bay's amended complaint alleges violations of 42 U.S.C. § 1983 of the Civil Rights Act by Chastain, Duell, and Ray, in their individual capacities; the City of Springdale; and O'Kelley, in her official capacity as Springdale Chief of Police.  Section 1983 allows individual employees of state and local government to be sued for damages or for declaratory or injunctive relief when they have

---

[3] As part of custody and visitation proceedings unrelated to the criminal charge against Bay, Bay agreed to supervised visitation with PB, to not bathing or showering PB during visitation, and to not having overnight visitation with PB, at least for a period of time.

acted under color of state law to cause a citizen to be deprived of his constitutional rights. 42 U.S.C. § 1983.   Here, Bay asserts that Chastain, Duell, and Ray violated his Fourth Amendment right to be free from unreasonable search and seizure and his Fifth Amendment right not to be deprived of life, liberty, or property without due process of law, as applied to the State and its officers through the due process clause of the Fourteenth Amendment.   Bay also makes state law tort claims against Chastain, Duell, Ray, and Ms. Bay, including false imprisonment, malicious prosecution, abuse of process, outrage, defamation, negligence, invasion of privacy, and state constitutional rights violations.  Bay's claims against the City of Springdale, by and through O'Kelley, arise under § 1983 due to an alleged unconstitutional policy or custom that was the moving force behind the deprivation of Bay's constitutional rights.   Additionally, Bay claims that the City of Springdale failed to properly train its police officers to avoid violating citizens' constitutional rights, and that failure to train shows a deliberate indifference to the need for such training.

 Due to Bay's arrest and subsequent legal proceedings, Bay was unable to have any contact with PB for approximately four months.   He also claims to have suffered mental anguish, emotional distress, damage to his reputation, embarrassment, and economic loss as a result of Defendants' actions.

## III.  Discussion

The circumstances of this case are unfortunate.  Plaintiff Bay, a schoolteacher and father, was apparently accused of a crime he did not commit.   What makes the accusation all the more troubling is that the alleged victim was Bay's own four-year-old daughter, and the crime of which Bay was accused was sexual indecency with a child—his own child—which is one of the most serious charges that can be leveled against a parent.

-11-

Ongoing domestic relations conflicts provided the backdrop for the dual criminal and civil cases that were eventually filed against Bay. No one contests that at the time these allegations were made, Bay was estranged from his ex-wife and disagreed with her over parenting issues involving PB. Ms. Bay became concerned that PB, who was only in pre-school, was acting out sexually, and that some of PB's behaviors and statements in relation to her father suggested that her father was sexually abusing her. Ms. Bay confided these concerns to her friends, some of whom were educators, and also to PB's teachers, therapists, and caregivers. Ms. Bay, who works for Springdale public schools, stated in her deposition that she knew that Arkansas law required certain professionals, including teachers, school counselors, child care workers, and mental health professionals, to report any incidence of child abuse or neglect to the State, even if the abuse was not witnessed firsthand.

When Ms. Bay told various "mandatory reporters" of child abuse[4] about her concerns that Bay was sexually abusing PB, these revelations set off a chain of events that led to Bay's arrest, the filing of criminal and civil charges against him, and his immediate public and professional humiliation. All of this occurred despite the fact that Ms. Bay concedes that she never witnessed Bay doing anything "inappropriate sexually" with PB. (Doc. 98-1, p. 36). Bay's job as a teacher, his standing in the community, and relationship with his daughter were all negatively affected by these allegations of abuse.

Even though reasonable persons examining the events leading up to Bay's arrest could, particularly with the benefit of hindsight, identify various ways in which DHS investigators and law

---

[4] In her deposition, Ms. Bay named the persons she thought had made Hotline calls regarding PB and Bay but refused to confirm or deny whether she also made Hotline calls.

enforcement might have viewed the facts, investigated the case, or even conducted the arrest of Bay so as to minimize or eliminate the dramatic impact that these allegations had on Bay's life, the fact is that all Defendants moving for summary judgment are state actors. As such, and according to the facts of the case and the relevant law, they are entitled to protection and immunity for decisions made and actions taken in the course of investigating and prosecuting Bay, despite the fact that in the end, all charges against Bay, both criminal and civil, were dropped or dismissed.

### A. Defendants City of Springdale, O'Kelley, and Ray's Motion for Summary Judgment

"[T]he Constitution does not guarantee that criminal charges will be filed only against the guilty." *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 977 n.6 (8th Cir. 1993). Moreover, every defendant ultimately acquitted of criminal charges does not have a § 1983 cause of action against the State. *Baker v. McCollan*, 443 U.S. 137, 145 (1979). Keeping these legal truths in mind, the Court will apply the facts in this case, as construed in the light most favorable to Bay, to the legal claims made against the City of Springdale and its two employees: Ray, the police detective primarily responsible for investigating the criminal case against Bay and recommending to the prosecutor that charges be brought, and O'Kelley, the Chief of Police and Ray's supervisor.

Bay claims that the City of Springdale violated his right to due process by adopting or failing to adopt rules, regulations, customs, or procedures that led to the issuance of a "false and misleading affidavit" for his arrest. Bay further asserts that the City of Springdale, by and through O'Kelley, afforded Ray and other officers too much discretion to act on their own in conducting investigations and drafting affidavits to support arrest warrants. This failure to train or supervise officers allegedly resulted in a violation of Bay's constitutional rights.

-13-

### 1. Claims Against City of Springdale/O'Kelley

Bay argues that his constitutional rights were violated by City of Springdale employees Ray and O'Kelley. Specifically, Bay alleges that Ray and O'Kelley "violated his rights to be free from the loss of his life, liberty, and property without due process of law . . . when they executed arrest and search warrants against him without probable cause, and initiated criminal charges for sexual indecency with a minor without probable cause and without any evidence of such crime." (Doc. 96, pp. 27-28). To be clear, Bay does not allege that O'Kelley personally participated in his investigation and arrest. Instead, Bay maintains that O'Kelley failed to properly train Ray or put policies in place that would have prevented the alleged constitutional deprivations that Bay experienced in the course of his arrest and subsequent legal process.

A municipality can be liable under § 1983 if an action pursuant to official municipal policy or custom caused a deprivation of constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). There must be a causal connection between the municipal policy or custom and the alleged constitutional deprivation in order to state a valid claim under § 1983. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Even assuming arguendo that Bay suffered a constitutional deprivation through a due process violation, Bay has failed to assert any facts that would demonstrate the existence of an actual policy or custom by the City of Springdale that caused such a deprivation. Bay must resort to speculation to make his claim. Bay reasons that since his rights were violated because Ray executed an affidavit for arrest "without oversight or regard for the truth," the Court should assume that a municipal policy *must have been* in place to sanction such a practice or, in the alternative, a policy *must not have been* in place "to protect the citizens of the municipality from rogue officers." (Doc. 86, p. 28).

-14-

The Court finds that more than mere speculation is required for claims to withstand summary judgment.  The Court cannot assume the existence of a policy that either encourages or fails to discourage police officers from swearing out false affidavits and pursuing criminal charges against innocent men.  *See Chambers v. St. Louis Cnty.*, 247 Fed. Appx. 846, 848 (8th Cir. 2007) (speculative allegations about policy to condone and conceal police brutality were conclusory and thus subject to dismissal on summary judgment).

A "policy" that is analyzed under *Monell* is "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).  Assuming O'Kelley, as Chief of Police, is the municipal official who possesses final authority regarding choosing a principle or procedure to be exercised by the City of Springdale's police officers, there is no evidence that O'Kelley established any policy designed to or having the intended effect of violating citizens' constitutional rights.  To the contrary, the Springdale Police Policy Manual, which was approved and signed by O'Kelley, contains policies intended to protect the rights of citizens.  *See* Doc. 100-3.  The Manual states: "It is the policy of the Springdale Police Department to exercise only those powers and authority established by law and within the discretionary limits as provided by policy and sound judgment." *Id.* at p. 1.  The Manual also specifies that arrests may only be made with probable cause, and that an officer's "proper exercise of discretion does not relieve the officer of his responsibility to conduct a thorough investigation." *Id.* at pp. 4-5.  In the face of this clear evidence of the express policies of the Springdale Police Department, the Court concludes that these policies do not, by their plain wording, require officers to engage in unconstitutional conduct or result in such conduct.

As for Bay's argument that the City of Springdale has adopted a custom, notwithstanding its

official policies, of violating citizens' constitutional rights, the Court finds that Bay failed to come forward with enough evidence for a reasonable jury to conclude a relevant municipal custom exists. To establish the existence of a municipal custom, a plaintiff must satisfy the following three requirements:  (1) a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct after notice to the officials of that misconduct; and (3) the plaintiff's injury by acts pursuant to the governmental entity's custom. *Mettler*, 165 F.3d at 1204.

Bay has failed to allege any facts that establish the existence of a continuing, widespread pattern of misconduct by the police in general or by Ray specifically.  Further, Bay gives no examples of deliberate indifference or tacit authorization of such conduct after either actual or constructive notice to Ray, O'Kelley, or any other Springdale police officer.  Bay provides no examples, other than his own, of citizen complaints about police misconduct.  The Eighth Circuit has held that, in general, an isolated incident of alleged police misconduct cannot, as a matter of law, establish a municipal policy or custom creating liability under § 1983. *Wedemeier v. City of Ballwin*, 931 F.2d 24, 26 (8th Cir. 1991).  Therefore, the § 1983 claim against the City of Springdale must be dismissed with prejudice.

Bay also brings suit against O'Kelley in her official capacity as Springdale Chief of Police. "A suit against a government actor in his official capacity is treated as a suit against the government entity itself." *Brockinton v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007) (citations omitted). Therefore, Bay's claims against O'Kelley are redundant to the claims already pleaded against the City of Springdale.  To the extent Bay alleges a failure-to-train claim against the City of Springdale

-16-

by and through O'Kelley,[5] "a municipality can be liable for failure to train its employees when the municipality's failure shows 'a deliberate indifference to the rights of its inhabitants.'" *Farmer v. Brennan*, 511 U.S. 825, 840 (1994) (quoting *Canton*, 489 U.S. at 389).  To prove "deliberate indifference" sufficient for a claim to survive summary judgment, Bay must present a question of fact as to whether the City of Springdale, by and through O'Kelley, was on notice that its training procedures "were inadequate and likely to result in violation of constitutional rights." *Larkin v. St. Louis Hous. Auth. Dev. Corp.*, 355 F.3d 1114, 1117 (8th Cir. 2004) (internal quotation omitted). Such notice may be proven by demonstrating that citizens' constitutional rights are so likely to be violated due to a lack of training that the need for better training is obvious, or by showing a regularly occurring pattern of misconduct indicating a lack of training.  *Id.*  Here, it is evident that Bay failed to establish a material question of fact as to whether the City of Springdale was on either actual or constructive notice that there was a need for further police training due to a clear pattern of misconduct.  Accordingly, Bay's failure-to-train claim cannot withstand summary judgment.

### 2. Federal Claims Against Ray

Ray is accused of conducting an incomplete investigation of the allegations against Bay without consideration of relevant, potentially exculpatory facts; drafting a materially false affidavit in support of the warrant to arrest Bay; arresting Bay without probable cause; and submitting materially false information to the Washington County Circuit judge in order to obtain a search warrant to enter Bay's home and seize Bay's computer.  With regard to the search warrant, Bay

---

[5]  The Court questions whether Bay wishes to persist in his failure-to-train claim, as it was not addressed at all in his response to the City of Springdale's motion for summary judgment. *See* Doc. 96.  However, in an abundance of caution, and since the claim appears in the amended complaint, the Court will consider this claim's validity.

alleges that Ray knew he lacked probable cause to search Bay's home and seize his computer, and despite this, Ray lied to the judge issuing the search warrant and falsely claimed that Bay's computer was in imminent danger of removal and was needed to corroborate a victim's statement.

The federal claims against Ray are brought pursuant to § 1983 for alleged violations of Bay's Fourth and Fourteenth Amendment rights. Section 1983 states, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.

"Qualified immunity shields a public official from suit for civil damages when his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bernini v. City of St. Paul*, 665 F.3d 997, 1002 (8th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Such immunity applies to shield the conduct of state actors, such as police officers, engaged in their official duties *unless* the evidence establishes (1) that a plaintiff's constitutional rights were violated, and (2) those rights were so clearly established at the time of the alleged violation that a reasonable officer would have known that his actions were unlawful. *Id.*

To avoid a finding that Ray is entitled to qualified immunity for his actions in this case, Bay must first establish that his constitutional rights were violated because of Ray's actions. Bay contends that his Fourth Amendment rights were violated when Ray made false statements in an affidavit in support of the warrant for Bay's arrest. Similarly, Bay maintains that Ray made false

statements in an affidavit made in support of a warrant to search Bay's house and seize Bay's computer. Lastly, Bay argues that his Fourteenth Amendment right to "have a relationship with his daughter," as he terms it, was violated through Ray's investigation and arrest of Bay, which resulted in Bay having no contact with PB for approximately four months.

If Bay successfully asserts a violation or violations of his constitutional rights, then he must demonstrate that these rights were clearly established at the time they were allegedly violated, such that the unlawfulness of those actions would have been apparent to the reasonable officer. *See Omni Behavioral Health v. Miller*, 285 F.3d 646, 653 (8th Cir. 2002) (finding no clearly established liberty or property right to be free from child abuse investigation).

### a.      Arrest and Search Warrant

According to Bay, Ray "provided materially false and misleading information in his affidavit for warrant of arrest to the Washington County Circuit Judge: that 'the child victim stated that the suspect had her bathe and shower with him, and that during that time he would expose himself while unclothed to the victim, and the subject would masturbate in front of the victim.'" (Doc. 49-1, p. 1). Duell, the prosecutor who brought criminal charges against Bay, relied upon Ray's affidavit when signing the warrant application. Bay maintains that he was unlawfully arrested in violation of the Fourth Amendment to the Constitution, which protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A warrant based on an affidavit obtained with a reckless disregard for the truth violates the Fourth Amendment. *Bagby v. Brondhaver*, 98 F.3d 1096, 1098 (8th Cir. 1996).

The Court turns to the analysis of whether Ray is entitled to qualified immunity for preparing the affidavit that led to Bay's arrest and detention. The qualified immunity standard affords law

enforcement officials a wide berth for mistaken judgments "by protecting all but the plainly incompetent or those who knowingly violate the law." *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) (internal quotation and citation omitted).   However, "[w]here the judicial finding of probable cause is based solely on information the officer knew to be false or would have known was false had he not recklessly disregarded the truth, not only does the arrest violate the fourth amendment, but the officer will not be entitled to good faith immunity."   *Small v. McCrystal*, 708 F.3d 997, 1006 (8th Cir. 2013) (internal quotation and citation omitted).

Here, Bay has submitted no evidence that Ray knew the statements he made in the affidavit for arrest were false, and further, the Court finds that the statements were not objectively false.   PB did, in fact, state in her interview that Bay "had her bathe and shower with him, and that during that time he would expose himself while unclothed," just as the affidavit recites.   (Doc. 49-1, p. 1).   As for Ray's conclusion in the affidavit that Bay "would masturbate in front of the victim," even Bay admits that the gestures and descriptions PB relayed in her interview could be subject to different interpretations and merited further investigation.   *See* Doc. 83-2, p. 6.   Rather than accuse Ray of telling outright lies in the affidavit, Bay accuses Ray of exhibiting a reckless disregard for the truth by purposely ignoring interpretations of the evidence that would tend to point to Bay's innocence, failing to critically assess the videotaped interview of PB, and failing to acknowledge Ms. Bay's role in possibly influencing PB's testimony.

The test for determining if statements in an affidavit were made with reckless disregard for the truth requires a court to assess whether, "viewing all of the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."   *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir.

1995).  Here, viewing all the evidence Ray had in his possession at the time he created the affidavit, the Court finds that there is no genuine material fact in dispute as to whether Ray entertained serious doubts as to the truth of his statements.  He clearly described in his deposition the statements and gestures he relied on from PB's interview to come to the conclusion that Bay had masturbated in front of his daughter.  (Doc. 98-5).  Having viewed the interview, the Court agrees that a reasonable police officer viewing PB's interview could have come to the conclusions Ray did.

It bears mentioning that in cases of allegations of child sexual abuse, the statements of a child should not be deemed less credible than those of an adult simply because of the child's age and particular vulnerabilities.  *Myers v. Morris*, 810 F.2d 1437, 1456-57 (8th Cir. 1987) (citation omitted), *abrogated on other grounds by Burns v. Reed*, 500 U.S. 478 (1991).  Law enforcement may rely on the testimony of children.  *Id.*  Moreover, the Eighth Circuit has opined that inconsistencies or hesitation in a child's testimony, when that child has been subjected to abuse, are quite common and are not grounds for discounting the child's testimony.  *Id.* at 1460.  Here, Ray gave weight to the interview of PB in determining whether there was probable cause to arrest Bay.  Giving such weight, in and of itself, was not improper.

When Ray composed the affidavit for Bay's arrest, Ray focused on certain information and conclusions he drew from PB's interview and did not include all the facts, inferences, and conclusions that were possible.  Bay alleges that Ray's failure to include certain "exculpatory" facts in the affidavit rendered it materially false.  Some examples of these exculpatory facts, which Bay believes tend to point to his innocence, are PB's hesitation during the interview to agree that what she was saying was true, and PB's periodic confusion about some of the questions being asked of her.

-21-

In reviewing Ray's affidavit and comparing it to PB's videotaped interview, the Court disagrees with Bay that Ray omitted facts that were "exculpatory" in nature. Evidence that is truly exculpatory, such as the contrary testimony of an eyewitness, is evidence that tends to conclusively establish a suspect's innocence. *See, e.g., Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) (explaining the difference between exculpatory evidence, which cannot be discounted by an officer contemplating an arrest, and other types of evidence). It is reasonable to conclude that PB's interview was subject to multiple interpretations, some of which pointed to Bay's guilt, and some of which pointed to his innocence. Courts have recognized that police officers such as Ray are entitled to weigh the credibility of witnesses in making a probable cause determination. *See id.* This is exactly what Ray did: he weighed the credibility of PB, drew conclusions from her statements, and determined that her words and actions meant that she had witnessed a live sex act, rather than something more innocuous.

The doctrine of qualified immunity provides "ample room for mistaken judgments" and reasonable errors, and therefore cannot be denied to a police officer who uses his experience and discretion to interpret facts in a particular way, when those facts are potentially subject to multiple reasonable interpretations. *See Malley v. Briggs*, 475 U.S. 335, 343 (1986). For this reason, when assessing the totality of the evidence before Ray, including PB's interview, the multiple Hotline calls, Ms. Bay's statement, and the opinions of other investigators who had experience interviewing children who were victims of sexual abuse, the Court cannot find that Ray recklessly disregarded the truth at the time he created the affidavit, or that other reasonable police officers in Ray's position would have suspected that relying on the affidavit as the basis for an arrest warrant would lead to the violation of Bay's constitutional rights. At the very least, officers of reasonable competence could

disagree about whether the statements in the affidavit were true, which means Ray's qualified immunity must be preserved.

Moving on to the related question of whether Bay's arrest was made with probable cause, the question for purposes of Ray's entitlement to qualified immunity is not whether probable cause existed in fact, but whether *arguable* probable cause existed. *Copeland v. Locke*, 613 F.3d 875, 880 (8th Cir. 2010). "In the wrongful arrest context, officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010). Though the criminal charge against Bay was "nolle prossed," and the civil case against him by DHS was dismissed, Ray is entitled to qualified immunity "when the totality of circumstances demonstrates that a prudent person would believe that the arrestee has committed or was committing a crime." *Kuehl*, 173 F.3d at 650.

Ray believed that the affidavit he drafted in support of the arrest warrant established probable cause to arrest Bay. No evidence of malice, collusion, or improper motive by Ray has been demonstrated to the Court through competent evidence,[6] and the Court's review of the voluminous exhibits in this case reveals no improper motive for Ray choosing to target Bay for arrest. Moreover,

---

[6] Bay states that Ray "acted with malice towards Plaintiff and in disregard for the truth" (1) by telling Ms. Bay that Bay was guilty of sexual indecency with PB; (2) by telling Ms. Bay that Bay was "playing cat and mouse games" with the police and "talk[ing] in circles;" and (3) by "intentionally exaggerat[ing] the facts and insert[ing] his opinion as facts into the affidavit [for warrant of arrest]." (Doc. 96, pp. 19 & 21). Bay also states that Ray's post-arrest interrogation, which was recorded and submitted to the Court (Doc. 98-11), shows Ray's malice toward Bay. However, none of this evidence, including the police interrogation, raises a genuine issue of material fact as to whether Ray exhibited spite, hatred, vindictiveness, or reckless disregard of Bay's rights. *See Ark. Dept. of Envtl. Quality v. Al-Madhoun*, 374 Ark. 28, 37 (2008) (defining "malice" under Arkansas law).

as discussed above, the Court finds that Ray's affidavit supporting arrest was not drafted with a reckless disregard for the truth in violation of Bay's Fourth Amendment rights.  In addition, though not specifically discussed by Ray, it is evident that exigent circumstances may have fueled Ray's decision to move forward on the arrest before Bay had the opportunity to secure counsel and make a voluntary statement in response to the charges against him.  Ray believed that PB was being sexually abused by her father and was due to have unsupervised visitation with him in the week following her CSC interview.  These circumstances support the Court's conclusion that Ray had at least arguable probable cause to arrest Bay.

The last Fourth Amendment claim the Court must address with respect to Ray concerns the affidavit Ray submitted to obtain a search warrant for Bay's house and computer.  Bay contends that his Fourth Amendment rights were violated because the affidavit accompanying the search warrant affirmed that Bay's home was a "crime scene" and that his computer was "in danger of imminent removal" and "may contain evidence to corroborate the victim's statement with regards to the crime of Sexual Indecency With a Child."  (Doc. 49-1, p. 3).  Bay does not dispute, however, that Ms. Bay told Ray that she had received incriminating emails sent from Bay's computer suggesting sexual misconduct with PB.

"In the context of obtaining a warrant, a police officer will lose qualified immunity only if the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable."  *Brockinton*, 503 F.3d at 674.  The Court has already explained above that it was objectively reasonable for Ray to rely on the statements of PB that indicated she had been sexually abused.  Ray's conclusion that probable cause existed to arrest Bay was also objectively reasonable, considering the totality of the circumstances.  When Ms. Bay informed Ray that she had

-24-

received incriminating emails from Bay that she could no longer access and that corroborated the allegations of sexual abuse, Ray reasonably sought to seize Bay's computer to look for "evidence to corroborate the victim's statement with regards to the crime of Sexual Indecency With a Child." (Doc. 49-1, p. 3).

As to whether Bay's house was a "crime scene" or his computer was in "imminent danger of removal," these statements do not appear to be accurate. However, when a false statement is made in an affidavit for a search warrant, "[t]he warrant is invalid only if without the allegedly false statement the affidavit is insufficient to establish probable cause." *United States v. Valentine*, 984 F.2d 906, 909 (8th Cir. 1993). Here, even if the false statements are disregarded, the affidavit would still support a finding of probable cause to enter Bay's home and seize his computer based on the existence of potentially incriminating emails.

Accordingly, Ray is entitled to qualified immunity on all of Bay's Fourth Amendment claims, as the evidence when viewed in the light most favorable to Bay does not establish that any Fourth Amendment violations occurred as a result of Ray's actions. These claims are dismissed with prejudice.

### b.    Due Process

Bay appears to argue that Ray's investigation of the sexual indecency case against Bay was undertaken with a lack of due care and was so cursory and biased so as to have violated Bay's clearly established right to familial integrity. The Eighth Circuit observed in *Manzano v. South Dakota Department of Social Services* that in child abuse cases "it is nearly impossible to separate the constitutional violation analysis from the clearly established right analysis" required for purposes of determining qualified immunity. 60 F.3d 505, 510 (8th Cir. 1995).

-25-

The right to familial integrity, which to Bay amounts to having regular, uninterrupted, unsupervised contact with PB, appears to be a recognized constitutional right.  *Heartland Acad. Cmty. Church v. Waddle*, 595 F3d 798, 809 (8th Cir. 2010) (listing cases in which the right, or some variant of the right, was recognized); *Dornheim v. Sholes*, 430 F.3d 919, 925 (8th Cir. 2005) ("We have long recognized that parents have a liberty interest in familial relationships and have an important substantive due process right to control the care and custody of their children.").   Even so, when a parent is suspected of abusing his own child, the parent's right to familial integrity must be balanced against the interests of the child to be free from abuse.  *Manzano*, 60 F.3d at 510 (finding that right to familial integrity is not absolute or unqualified).  "The liberty interest in familial relations is limited by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." *Myers*, 810 F.2d at 1463.   Because the interests of the state in protecting a child must be balanced against the interests of the parent in maintaining a familial relationship with the child, "when a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse." *Manzano*, 60 F.3d at 511.

Examining the pre-arrest investigation by Ray, there does not appear to be a dispute of fact that Ray: (1) viewed the interview of PB; (2) spoke with Chastain and potentially others from the CSC about the implications of PB's statements made during the interview; (3) received Chastain's summary of the interview, which interpreted PB's gestures as masturbation gestures; (4) spoke with Ms. Bay after PB's interview about the Hotline calls that had been made about PB concerning the stuffed animal incident in 2009 and the lap incident in 2010; (5) attempted to speak with Bay at his

-26-

workplace and at his home; and (6) actually spoke with Bay briefly by telephone in an attempt to convince him to come to the police station and give a statement.

The Court has also viewed the videotape of Blackstone's interview of PB and agrees with Bay that the interview could be interpreted to mean that PB saw her father washing himself in the shower, or possibly urinating or "shaking off" after urination.  That said, another reasonable interpretation is that PB witnessed Bay masturbating.  Of course, all parties know now, after the fact, that PB recanted her statement, and no evidence exists to show that Bay actually masturbated in front of PB.  However, for qualified immunity purposes, whether Ray's interpretation was ultimately correct or incorrect is immaterial; instead, what matters is whether the evidence before Ray at the time of the alleged violation of Bay's constitutional rights created a reasonable suspicion that child abuse had occurred.

Bay concedes that if another child had come to him describing the types of incidents that PB described in her interview, Bay, as a schoolteacher and mandatory reporter of child abuse, would have been concerned.  (Doc. 83-2, p. 6).  It follows that even Bay recognizes that PB's statements in her interview could be interpreted to mean that her father masturbated in front of her or otherwise did something that was sexually explicit, illegal, and inappropriate.

While Bay argues that the *only* reasonable interpretation of PB's words and actions in the interview is an innocuous one, this view is itself unreasonable.  Taking PB's interview and considering it with the rest of the evidence Ray collected prior to arresting Bay, the Court finds that Ray is entitled to qualified immunity on Bay's due process claims because Ray's investigation was founded on a reasonable suspicion of child abuse.  Because Ray had a reasonable suspicion that PB was being abused by Bay, the State's interest in protecting PB from further abuse outweighed Bay's

right to familial integrity.

As to whether Bay's right to due process was violated in the course of Ray's pre-arrest investigation, the case of *Kuehl v. Burtis* provides guidance to the Court. 173 F.3d at 650. In *Kuehl*, the Eighth Circuit found that a police officer was not entitled to qualified immunity because he "ignored plainly exculpatory evidence that negated the intent required for simple assault." *Id.* This exculpatory evidence included an eyewitness's account of the alleged assault as well as physical evidence corroborating the eyewitness's account. The eyewitness whose account was disregarded was present at the scene when the police officer arrived and attempted to give the officer his statement, but it appears that the officer not only declined to take the witness's statement but also told the witness that the officer was "not interested" in what the eyewitness had to say. Meanwhile, a different eyewitness initially gave a statement to police that implicated Kuehl in the alleged assault, but later attempted to retract the statement at the scene. It appears that the officer ignored the retraction and wrote his report using the original statement made by the witness. *Id.* at 649. Kuehl was interviewed by the officer "for only about twenty seconds." *Id.* at 648. Before leaving the scene, the officer said, "I've made up my mind," and arrested Kuehl on the spot. *Id.* at 649. The prosecutor eventually dropped all charges against Kuehl.

In contrasting the facts in *Kuehl* to the facts in Bay's case, it is clear that Ray's investigation was unlike the investigation of the police officer in Kuehl who was denied qualified immunity. First, Ray was never presented with a witness statement or other evidence that was potentially exculpatory. Second, as far as the Court is aware, Ray never refused to take the statement of a witness. Third, Ray attempted to interview Bay before arresting him, but was unsuccessful. Finally, even though Bay was arrested only two days after PB was interviewed, and prior to Bay securing counsel and

giving a voluntary statement to police, the Court is not convinced that there was an absence of exigent circumstances in this case.  On the contrary, it is evident that Ray believed PB was being sexually abused by Bay and that PB could potentially suffer such abuse within days of giving her interview, the next time Bay was scheduled to have unsupervised visitation.

"[L]aw enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances . . . ." *Id.* at 650.  Officers must also "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of [] arrest and detention." *Romero v. Fay*, 45 F.3d 1472, 1476-77 (10th Cir. 1995).  Considering these factors, the Court finds that if Bay had a due process right to a reasonably thorough pre-arrest investigation, this right was not violated by Ray.  Therefore, Ray is entitled to qualified immunity on Bay's due process claim, and this claim is dismissed with prejudice.

### B.     Defendants Chastain and Duell's Motion for Summary Judgment

#### 1.     Claims Against Chastain

The Court analyzes Chastain's liability in this case in much the same way it analyzed Ray's liability.  Chastain, who is an Arkansas State Police investigator of child abuse cases, viewed PB's interview with Blackstone, discussed the interview with Blackstone, and then prepared a "Referral Acceptance Snapshot," which was a brief summary of the interview, and forwarded it to Ray.  *See* Doc. 98-9, pp. 1-9. This "Snapshot" and Chastain's later-prepared, more detailed summary of the interview were relied upon by Ray in determining whether criminal charges should be brought against Bay.

Chastain's "Snapshot" summary of PB's interview states that PB's father slept with PB and

took a shower with her, and that he "wiggles his penis and stuff comes out."  Chastain's more detailed interview summary does not state that Bay masturbated in front of PB and does not include the term "masturbation," but instead uses PB's words, including that her father "showed [her] his wiener" and that "he wiggled it at her" "to get the water out."  The detailed summary, according to Bay, "omits the inconsistencies in PB's statements and certain other statements such as PB at one time acknowledging that what she said about dad showing his wiener was 'not true' and fails to mention the probable interpretation that PB may have been attempting to demonstrate what a man may sometimes do following urination—yet Chastain knew this was a possibility."  (Doc. 102, p. 4).

Chastain also prepared a report on December 8, 2010, well after Bay's arrest, in which she recommended to the prosecutor that there was "a preponderance of evidence to support Sexual Abuse—Exposure to Live Sex Acts; 12-18-103."  (Doc. 98-9, p. 11).  She testified in her deposition that because of this recommendation, an order of "less than custody" was entered against Bay, and his visitation rights were suspended.  (Doc. 98-4, p. 86).  She also testified that some of the information about Bay in this December 8 report came from Ray's notes and from her discussions with Ray about the criminal case against Bay.  Chastain never interviewed Bay or viewed a recording of Bay's interrogation by police.

Chastain is named in Count XI of the amended complaint, which specifically alleges § 1983 liability for Chastain's violation of Bay's "right to have a relationship with his daughter."  (Doc. 49, p. 22).  This right was discussed above as the right to familial integrity as provided by the Fourteenth Amendment.  In addition to this right, Bay also urges the Court to consider that Chastain violated Bay's Fourth Amendment right to be free from unreasonable search and seizure because she was "a

party actively involved in Mr. Bay's arrest."

The Court has already discussed the legal principles involved in determining whether qualified immunity applies to state actors, such as Chastain. Considering the facts in the light most favorable to Bay, the Court finds that Chastain is entitled to qualified immunity, as her conduct in this case did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Bernini*, 665 F.3d at 1002.

As discussed previously with regard to Ray's qualified immunity status, the interview of PB by Blackstone was subject to multiple reasonable interpretations. Chastain interpreted PB's interview to mean that PB had seen Bay masturbating in the shower. Even so, neither her "Snapshot" report nor her more detailed narrative account of PB's interview mentioned this ultimate conclusion. Instead, these reports described the interview using details Chastain felt were most relevant. As for Chastain's December 8, 2010, recommendation to the prosecutor, this report did come to the ultimate conclusion that sexual abuse occurred and that an order of "less than custody" should enter against Bay. In the Court's view, however, reasonable officers could disagree as to whether Chastain's interpretation of the evidence and her written summaries of PB's interview were accurate. Regardless, Chastain is still entitled to qualified immunity for any reasonable errors and mistaken judgments she might have made. *Amrine v. Brooks*, 522 F.3d 823, 831 (8th Cir. 2008).

The Court is also not convinced that Chastain's acts implicated Bay's Fourth Amendment rights at all, as she merely referred the case to Springdale Police, and it was Ray who conducted the police investigation, drafted the affidavit in support of the arrest warrant, and arrested and detained Bay. Even if Chastain's actions potentially violated Bay's Fourth Amendment rights, the Court finds that she is still entitled to qualified immunity, as those rights were not clearly established at the time

they were allegedly violated.  Furthermore, a reasonable officer in Chastain's position would not have known that summarizing her conclusions from the videotaped interview of PB and forwarding those conclusions to law enforcement would have been unlawful, as there is no evidence that Chastain acted with malice, a reckless disregard for the truth, or actual knowledge that the statements she made in her written reports were false.[7]

The question of whether PB demonstrated a masturbation gesture or some other gesture in the course of her interview with Blackstone is not relevant to the qualified immunity inquiry.  The material issue is how Chastain interpreted the interview and acted on her interpretations in comparison to how another reasonable officer, faced with the same evidence, would have acted. Using that logic, it is clear to the Court from reviewing Chastain's deposition testimony that Chastain actually believed that PB's hand gesture during her interview was a masturbation gesture. *See* Doc. 98-4, pp. 52-53.  Chastain described PB's gesture as "kind of vigorous" (*id.* at p. 53) and disagreed that it might be "a motion of what a man might do after he finishes urination." *Id.* at p. 52. After viewing PB's interview again during her deposition, Chastain decisively stated, "[t]o me, it looks more like masturbation."  *Id.*  As such a conclusion was objectively reasonable, considering the totality of the evidence, Chastain is entitled to qualified immunity for any reports she wrote in

_____

[7] Bay makes what he calls "reasonable inferences" that Chastain and Ms. Bay had a personal relationship prior to and during the course of the events referenced in the amended complaint.  Even though Chastain and Ms. Bay deny that any such relationship existed, Bay believes that Chastain's true motive for recommending that Bay be investigated for sexually abusing PB was "to assist Shannon Bay in gaining leverage or control in the divorce and custody battle between Joe Bay and Shannon Bay." (Doc. 102, p. 12).  Bay cites no evidence to support his theory, however, and in light of this, the Court must disregard these allegations as mere speculation.  "[M]ore than the mere recitation of an improper state of mind such as malice, bad faith, retaliatory motive or conspiracy is required to defeat qualified immunity for conduct which, absent that state of mind, would be constitutionally acceptable or protected by immunity." *Myers*, 801 F.2d at 1453.

which she expressed her belief that PB had witnessed a live sex act.

Turning to Bay's allegation that Chastain violated his Fourteenth Amendment right to familial integrity, the Court must balance this right against the State's *parens patriae* interest in protecting a child from abuse. *Myers*, 810 F.2d at 1463. An investigator such as Chastain who has a reasonable suspicion of child abuse will be entitled to qualified immunity even though her actions may otherwise disrupt a parent's familial integrity. *See, e.g., id.* at 1460 (qualified immunity given to detectives accused of engaging in improper interrogation of children who claimed to have been sexually abused); *Lux by Lux v. Hansen*, 886 F.2d 1064, 1067 (8th Cir. 1989) (social worker granted qualified immunity for separating child from father on charge of sexually abusing his daughter, "[a]lthough the facts, especially when viewed in hindsight, lend themselves to alternative interpretations"); *Manzano*, 60 F.3d at 513 (law enforcement investigation into allegations of child sexual abuse by a three year old against her father was "far from textbook perfect," but did not demonstrate "conduct so outrageous that it offends the substantive component of the Due Process Clause," and thus qualified immunity was proper).

The Court therefore finds that the information available to Chastain at the time was sufficient to support a reasonable suspicion that PB was being subjected to sexual abuse. Chastain does not lose qualified immunity protection for failing to include other possible interpretations of PB's testimony in the interview summary that was submitted to law enforcement and to the prosecutor. Although Bay correctly points out that PB was unclear at times and expressed hesitation when answering questions during the interview, "[i]t is not unusual for children to initially deny being abused" before disclosing the abuse "in a partial, halting fashion: approaching the threatening material and backing away, revealing abuse, then denying it." *Myers*, 810 F.2d at 1460 (citation

omitted).  For all of these reasons, Chastain is shielded from liability for Bay's federal claims, and they are dismissed with prejudice.

### 2.    Claims Against Duell

The federal claims pending against Duell were dismissed earlier in this litigation (Doc. 65), leaving only state law claims for defamation, negligence, and invasion of privacy.  As explained below, all state law claims in this lawsuit will be dismissed without prejudice, including those asserted against Duell.

### C.    State Law Claims

The basis for the Court's jurisdiction in this matter was the presence of a federal question or questions.  28 U.S.C. §§ 1331 & 1343.  Now that the federal claims against all Defendants have been dismissed, the Court declines to take supplemental jurisdiction over any remaining state law claims asserted in this matter.  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); 28 U.S.C.A. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . .").  The state law claims pending against Ray, Chastain, Duell, and Ms. Bay are dismissed without prejudice.

## IV.    Conclusion

IT IS ORDERED that Defendants City of Springdale, O'Kelley, and Ray's motion for

summary judgment (Doc. 83) is **GRANTED**, and all federal claims against these Defendants are **DISMISSED WITH PREJUDICE**, while all state claims are **DISMISSED WITHOUT PREJUDICE**.

IT IS FURTHER ORDERED that, pursuant to Plaintiff's stipulation of dismissal (Doc. 107), all claims against Defendants Lang, Blackstone, and CSC are **DISMISSED WITH PREJUDICE**, and, consequently, the motion for summary judgment that was filed by these Defendants (Doc. 87) is **DENIED AS MOOT**.

IT IS FURTHER ORDERED that Plaintiff's motion to voluntarily dismiss Defendant Ken Hunt (Doc. 101) is **GRANTED**, and all claims against Defendant Hunt are **DISMISSED WITH PREJUDICE**.

IT IS FURTHER ORDERED that Defendants Chastain, Duell, and Hunt's motion for summary judgment (Doc. 92) is **GRANTED IN PART AND DENIED IN PART AS MOOT**. The motion is **GRANTED** as to Chastain and Duell, and all federal claims against these Defendants are **DISMISSED WITH PREJUDICE**, while all state claims against them are **DISMISSED WITHOUT PREJUDICE**. The motion is **MOOT** as to Hunt, as Plaintiff has already voluntarily dismissed Hunt from the lawsuit with prejudice.

IT IS FURTHER ORDERED that the Court declines to take supplementary jurisdiction of the state law claims pending against Defendant Shannon Bay, and those claims are accordingly **DISMISSED WITHOUT PREJUDICE**.

IT IS FURTHER ORDERED that Defendants City of Springdale, O'Kelley, and Ray's motion for leave to file supplemental reply (Doc. 104) is **DENIED**.

IT IS SO ORDERED this 12th day of July, 2013.

*/s/ P. K. Holmes,* III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE